**SPEEDPLAY, INC., Plaintiff–Appellant,**

v.

**BEBOP, INC., Defendant/Cross–Appellant.**

**Nos. 98–1527, 98–1528.**

United States Court of Appeals, Federal Circuit.

Decided March 1, 2000.

Rehearing Denied March 24, 2000.

Eleanor M. Musick, Brown, Martin, Haller & McClain, of San Diego, California, argued for plaintiff-appellant.

Jeffrey L. Fillerup, Luce, Forward, Hamilton & Scripps, LLP, of San Francisco, California, argued for defendant-cross appellant. With him on the brief was Richard R. Spirra.

Before BRYSON, Circuit Judge, SKELTON, Senior Circuit Judge, and GAJARSA, Circuit Judge.

I

BRYSON, Circuit Judge.

Serious bicyclists often use pedal assemblies that enable them to secure their feet to the bicycle pedals. The effect of such assemblies is to allow the bicyclists to increase the power transmitted to the wheels by simultaneously applying a downward, pushing force with one foot and an upward, pulling force with the other. Clip-less pedal and cleat assemblies offer one method of performing that function. With clip-less pedals and cleats, a rider can attach his feet securely to the pedals yet release them easily, in contrast to earlier systems using straps or cages. The cleats attach to the rider's shoes and engage the pedals, which are specially designed to interact with the cleats. In most clip-less pedal systems, the rider attaches his foot to the pedal by stepping straight

down on the pedal until the cleat engages with the pedal. The rider typically releases his foot by rotating his foot to the side, which disengages the cleat from the pedal.

Richard Bryne, the chief executive officer and founder of Speedplay, Inc., is the inventor and primary designer of Speedplay's bicycle pedals. He obtained U.S. Patent No. 4,942,778 (the '778 patent) on a clip-less pedal and cleat system, and in 1992 entered the market with a product based on that patent. Shortly thereafter, Bryne was issued U.S. Patent No. 5,213,-009 (the '009 patent), which claims a multi-layered cleat design. Within two years of its founding, Speedplay entered into two agreements with Bryne. The first granted Speedplay a license under the '778 patent and improvements thereon, while the second assigned to Speedplay all of Bryne's bicycle-related inventions made during his employment with the company. Steven Zoumaras, who held a 50% interest in the '778 patent in return for financing its procurement, was also a party to the license, but he assigned his entire interest to Speedplay during the course of the trial.

John Steinberg, the president and founder of Bebop, Inc., is the inventor of the Bebop bicycle pedals. In 1989, Steinberg conceived the basic idea for the Bebop pedal, which features a hollow, cylindrical body. Over the next few years, Steinberg refined the concept, obtained a patent on the invention, and marketed two Bebop pedal designs.

Shortly after Bryne saw a Bebop prototype in 1993, the parties clashed over intellectual property and commercial tort issues. The dispute led to the present lawsuit, in which Speedplay claimed that Bebop was infringing the '778 and '009 patents by manufacturing and marketing the Bebop clip-less bicycle pedals. In addition, Speedplay alleged that Bebop was infringing Speedplay's trade dress under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), was engaging in unfair competition under California common law,

and was violating the California Business and Professions Code.

Bebop counterclaimed, seeking a declaration that the '778 and '009 patents were invalid, that they were not infringed by Bebop's products, and that Bebop's products did not infringe Speedplay's trade dress. Bebop also sought relief for alleged unfair competition and intentional interference with prospective economic advantage. While the case was pending, Bryne was issued U.S. Patent No. 5,606,894 (the '894 patent) on a clip-less bicycle pedal, and Speedplay amended its complaint to add an allegation of infringement of the '894 patent. Bebop responded by alleging that the '894 patent was invalid and that all three patents were unenforceable because of inequitable conduct.

Following a 10–day bench trial, the trial court entered judgment against Speedplay on all the claims in its amended complaint. With respect to Bebop's counterclaims, the court held the '894 patent invalid because the invention was on sale more than one year before the patent application was filed. *See* 35 U.S.C. § 102(b). The court denied relief to Bebop, however, on its state law claims, on its request to hold Speedplay's other two patents invalid and all three patents unenforceable, and on its request for attorney fees. Both parties appealed.

II

Bebop raises a threshold issue concerning Speedplay's right to bring an action for infringement of the '778, '009, and '894 patents in its own name. The trial judge concluded that Bryne had transferred "all right, title, and interest to the inventions" to Speedplay, thereby securing to Speedplay the right to sue individually for infringement of the patents. We agree that Speedplay has standing to maintain this suit.

A party may bring an action for patent infringement only if it is the "patentee," *i.e.,* if it owns the patent, either by

issuance or by assignment. *See* 35 U.S.C. §§ 100(d), 261, 281. A party that has been granted all substantial rights under the patent is considered the owner regardless of how the parties characterize the transaction that conveyed those rights. Thus, in *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 874, 873–76, 20 USPQ2d 1045, 1048, 1047–50 (Fed.Cir.1991), this court held that the proper focus is on "the substance of what was granted," and that the grantee of an exclusive license could sue in its own name without joining the grantor if the license had the effect of conveying all substantial rights in the patent to the licensee.

■ Speedplay asserts that it obtained all substantial rights in the '778, '009, and '894 patents from Bryne, and that it may therefore sue for infringement in its own name. To support that assertion, Speedplay must produce a written instrument documenting the transfer of proprietary rights in the patents. *See* 35 U.S.C. § 261; *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093, 45 USPQ2d 1368, 1370–71 (Fed.Cir.1998). Speedplay relies on two documents, a Contribution and License Agreement and a Confidentiality and Inventions Agreement, to support its assertion of patent rights. Bebop contends that those two documents are insufficient to allow Speedplay to sue in its own name.

### A

Through the Contribution and License Agreement (CLA), Speedplay issued common stock to Bryne and Zoumaras in exchange for broad rights in Bryne's initial pedal technology. The CLA defines two categories of rights. First, it defines "Licensed Product" as follows:

> Bryne and Zoumaras are the owners of a design for a clipless bicycle pedal system as described and claimed in the United States Letters Patent 4,942,778, issued July 24, 1990 to Richard M. Bryne and entitled CLIPLESS BICY-

CLE PEDAL SYSTEM ("Licensed Product").....

Second, it defines "Licensed Patents" as follows:

> Bryne is the inventor and title holder of United States Letters Patent 4,522,221, and related foreign patent applications (collectively, the "Licensed Patents").....

Based on those definitions, the grant to Speedplay consists of an "exclusive worldwide, royalty-free, right and license under and to the Licensed Patents and the exclusive rights and license to manufacture, have manufactured, distribute, market, use and sell the Licensed Product and any other apparatus, instrument, device or product covered in whole or in part by the Licensed Patents." In addition, the agreement permits Speedplay to exercise its granted rights through agents and sublicensees. All rights under the CLA terminate with the last to expire of the Licensed Patents, unless terminated earlier for various specified reasons such as breach or insolvency.

■ The primary problem with the CLA derives from the patent number cited in the definition of Licensed Patents. Although naming Bryne as the inventor, the definition refers to U.S. Patent No. 4,522,-221, which is an unrelated patent on unrelated technology issued and assigned to some unknown third parties. Speedplay asserted at oral argument that the reference to that patent was a scrivener's error and that a reference to the '778 patent was intended. That contention finds support in the portion of the CLA that refers to "the Licensed Product and any other apparatus ... covered ... by the Licensed Patents," which indicates that the term Licensed Patents was meant to refer to patents that covered the Licensed Product. In addition, another provision of the CLA requires Speedplay to mark each Licensed Product with a notice "identifying by U.S. patent number the Licensed Patent." Because a Licensed Product is a pedal system "described and claimed" by the '778

patent, the CLA could not logically require such a product to be marked with any patent number other than 4,942,778. Consequently, we agree with Speedplay that despite the patent number erroneously set forth in the CLA, the explicitly defined Licensed Patents must be construed to mean the '778 and related foreign patents.

The conclusion that Licensed Patents include the '778 patent undermines Bebop's main argument that the CLA did not transfer all substantial patent rights to Speedplay because Speedplay did not receive the right to enforce the '778 patent. Under the CLA, Speedplay has the "sole right to enforce the Licensed Patents," which we construe as giving Speedplay the right to enforce the '778 patent.

■ Bebop argues in the alternative that Bryne and Zoumaras retained other substantial rights in the '778 patent that would prevent Speedplay from suing on that patent in its own name. Bebop's strongest argument on this point derives from the following language of the CLA: "In the event that [Speedplay] fails to halt an infringement ... within three (3) months," then "Bryne and/or Zoumaras shall have the option to initiate appropriate legal proceedings in his/their own name." Relying on *Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128, 33 USPQ2d 1771 (Fed.Cir.1995), Bebop claims that the grantors' retention of that option is dispositive. We disagree.

In Abbott, the licensor retained an option to sue an infringer if the exclusive licensee did not. Even if the licensee brought suit, it could not manage the action in a manner that would compromise the licensor's rights in the patent and could not prevent the licensor from participating in the suit. In addition, the grant to the licensee was subject to prior-granted licenses and to a limited right of the licensor to make, use, and sell products embodying the patented invention. Finally, the licensee could not freely assign its license. Considering all the rights retained by the licensor, the court concluded

that the licensor was a necessary party to the infringement action brought by the licensee. *Abbott*, 47 F.3d at 1132, 33 USPQ2d at 1775.

Abbott does not control this case. Unlike in *Abbott*, the license grant was not subject to any prior-granted licenses or to any retained rights by the licensor to practice the patent. Moreover, the CLA does not grant Bryne and Zoumaras the right to participate in an infringement action brought by Speedplay, nor does it limit Speedplay's management of any such action. In addition, Bryne and Zoumaras's right to sue an infringer if Speedplay does not is illusory, because Speedplay can render that right nugatory by granting the alleged infringer a royalty-free sublicense. Although the licensee in Abbott could grant sublicenses, its right to do so was not unfettered, because it was liable for annual royalties on the sales of the sublicensees. *Abbott*, 47 F.3d at 1129, 33 USPQ2d at 1772. Speedplay thus controls enforcement of the '778 patent for all practical purposes. Even though Bryne and Zoumaras retained the right to sue, that right would not hinder Speedplay's enjoyment of the patent rights in any meaningful way.

■ Bebop next contends that under the CLA Speedplay cannot assign its interest in the license without the consent of Bryne and Zoumaras, and that Speedplay's rights in the patent are therefore curtailed. To be sure, the licensee's inability to assign its interest was a factor important to the holding in Abbott. But again the factual differences between Abbott and this case dictate a different outcome. The licensor in Abbott had an absolute right to veto any assignment proposed by the licensee, other than to a successor in business. *Abbott*, 47 F.3d at 1132, 33 USPQ2d at 1775. Under the CLA, however, Bryne and Zoumaras's consent to an assignment "shall not be withheld unreasonably." Bryne and Zoumaras's only reasonable basis for refusing consent would be the im-

pairment of their consideration for entering the CLA. As we held in *Vaupel*, 944 F.2d at 875, 20 USPQ2d at 1049, a licensor does not retain a substantial right in a patent merely by reserving a reversion in the patent contingent upon the licensee's financial distress or the licensee's cessation of production of machines embodying the patented invention. In effect, the Vaupel termination provision simply protected the licensor's consideration, which consisted in part of an ongoing royalty stream. Although the form of the protective mechanism differs in this case, the principle of Vaupel compels a conclusion that the consent requirement does not significantly restrict the scope of Speedplay's rights in the '778 patent.

■ Bebop next argues that the "Improvements" clause of the CLA leaves a significant right in Bryne and Zoumaras. The CLA defines an "improvement" to include "any invention or development that falls within the fair scope of any of the claims of the Licensed Patent." If Speedplay makes improvements during the term of the agreement, it is required to "assign to Bryne and Zoumaras, as tenants in common, all right, title and interest in and to the Improvements," including any related patents and patent applications. That right of Bryne and Zoumaras is limited, however, by the further provision of the CLA that "[t]he Improvements shall become part of the Licensed Patent for purposes of this Agreement." As a consequence of that provision, any party's successful effort to improve the pedal technology covered by the '778 patent during the term of the agreement would redound to Speedplay's exclusive benefit for that term. The Improvements clause thus serves to protect Bryne and Zoumaras's reversionary interest in any improvements, but not to limit Speedplay's proprietary interests in improvements made during the pendency of the agreement.

■ Finally, Bebop claims that Bryne and Zoumaras retain two additional substantial rights in the '778 patent. The CLA requires Speedplay to mark products intended for foreign sale "in accordance with written instructions" from Bryne and Zoumaras. The right to dictate the markings on products sold abroad may or may not be significant as a practical matter, but the right is certainly not one that interferes with the rights in a U.S. patent, which are limited in reach to the United States. *See* Vaupel, 944 F.2d at 875, 20 USPQ2d at 1049 (finding that the licensor's right to obtain foreign patents did not affect the patent-standing inquiry). The CLA also requires Speedplay to allow Bryne and Zoumaras to inspect Speedplay's books and records regarding the exercise of rights under the agreement. Given the CLA's provision for termination upon the insolvency of Speedplay, which is consistent with Vaupel's provision for termination upon bankruptcy, *see id.*, the inspection provision constitutes a policing mechanism, not a substantial proprietary right. Accordingly, we conclude that Bryne and Zoumaras retained no substantial rights in the '778 patent, and that Speedplay therefore may sue in its own name for infringement of that patent.

## B

Because the '009 patent claims a cleat that Speedplay and Bryne contend improves upon the cleat claimed in the '778 patent, Speedplay argues that it obtained all significant rights to the '009 patent pursuant to the Improvements clause of the CLA. Bebop does not challenge the basic factual contention that the '009 patent is an improvement on the '778 patent.

As noted above, Speedplay obtains the rights to improvements made after the effective date of the CLA by any party to that agreement. Bryne, Zoumaras, and Speedplay executed the CLA on December 15, 1991, with an agreed effective date of September 20, 1991. Bryne applied for the '009 patent on October 18, 1991, subsequent to the effective date of the CLA.

Speedplay therefore obtained all substantial rights to the '009 patent.

## C

Speedplay traces its rights in the '894 patent to the Confidentiality and Inventions Agreement (CIA) entered into on September 17, 1992, by Bryne as employee and Speedplay as employer. The CIA defines an "Invention" to be any intellectual property conceived or developed by Bryne within the scope of his employment and during the term of the agreement. All inventions covered by the CIA "shall belong exclusively to [Speedplay] and [Bryne] hereby conveys, transfers and assigns to [Speedplay] .-.-. all right, title and interest in and to Inventions." As the '894 parent application was submitted on April 29, 1994, Speedplay argues that it automatically obtained title to the '894 patent pursuant to the CIA. We agree.

■ Bebop challenges Speedplay's rights in the '894 patent on two grounds. First, Bebop contends that the CIA is merely a "promise to assign a future invention." That contention invokes this court's decision in *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574, 1576, 19 USPQ2d 1513, 1514 (Fed.Cir.1991), in which a contractor agreed that any inventions it conceived "'shall be the property of [the client], and all rights thereto *will be assigned'*" by the contractor to the client. Holding that the client could not bring an infringement action based on that contractual language, the Arachnid court characterized the promise as "an *agreement to assign*, not an assignment." *Id.* at 1580, 1580–81, 19 USPQ2d at 1518, 1518–19. The language in the CIA, however, differs significantly from the language at issue in *Arachnid*. It provides that inventions "shall belong" to Speedplay, and that Bryne "hereby conveys, transfers and assigns" the inventions to Speedplay. Therefore, this case is not controlled by *Arachnid*, but by *Filmtec Corp. v. Allied–Signal Inc.*, 939 F.2d 1568, 1570, 19 USPQ2d 1508, 1509 (Fed.Cir.1991), in

which the contractor agreed "'to grant and does hereby grant'" to the client the rights and title to any invention, whether patentable or not. In *Filmtec*, this court stated that "no further act would be required once an invention came into being; the transfer of title would occur by operation of law." *Id.* at 1573, 939 F.2d 1568, 19 USPQ2d at 1512.

Second, Bebop seeks to distinguish between the assignment of a future invention and the assignment of the patent on that invention, implying that the CIA does not cover the latter. *Filmtec*, which linked title to the invention and title to the ensuing patent, also disposes of that argument.

## D

■ Our disposition of the standing issue in this case does not expose Bebop to the risk of prejudice that can result from improper joinder of parties in a suit for patent infringement. By restricting the availability of a remedy for infringement to the de facto owner of the patent, the standing doctrine serves "to enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all subsequent actions." *Independent Wireless Telephone Co. v. Radio Corp. of America*, 269 U.S. 459, 468, 46 S.Ct. 166, 70 L.Ed. 357 (1926).

■ Bebop will not be exposed to a successive suit on the same subject matter brought by Bryne in his own name. Confirming inferences drawn from the record, counsel for Speedplay admitted at oral argument that Speedplay is a closely held corporation and that Bryne controls the operation of Speedplay. Also, the record clearly shows that Bryne participated actively in the conduct of the action on behalf of the corporation. Consequently, the judgment in this case will have preclusive effect with respect to any parallel claim that might be brought by Bryne. *See, e.g., Rhode Island Hosp. Trust Nat'l Bank v.*

**1254**

*Bogosian (In re Belmont Realty Corp.)*, 11 F.3d 1092, 1097 (1st Cir.1993); *Kreager v. General Elec. Co.*, 497 F.2d 468, 472 (2d Cir.1974); *Restatement (Second) of Judgments* § 59(3)(a) (1982). In addition, Speedplay offered before trial to join Bryne as a party, but Bebop resisted that motion. Bebop therefore cannot now reasonably complain that it is prejudiced by having to defend a lawsuit brought by Speedplay without the participation of Bryne as a party.

### III

Speedplay alleges that two of Bebop's products infringed the '778 and '009 patents. The first, designated the Bebop–1, was sold between 1995 and 1997. The second, designated the Bebop–2, first sold in 1997.

The Bebop–1 pedal consists of a spindle that penetrates through a rotating metal cylinder that is open on the top and bottom and partially open on the sides. Either of the roughly circular edges that constitute the top and bottom of the cylinder can engage with the cleat, whereupon spring-loaded tongues on each side of the cleat secure the pedal to the cleat by protruding into the openings in the sides of the cylinder.

In the Bebop–2, the cylindrical portion of the pedal does not consist of a single piece of metal, but comprises two circular metal rings that correspond generally to the two edge-portions of the Bebop–1 cylinder. The two rings are connected by screws to each other and to the spindle housing, so that the space between the two rings is largely open except for the spindle housing. Either of the two rings can engage with the spring-loaded tongues in the cleat in the same way that the top or bottom edge of the Bebop–1 cylinder can engage with the cleat.

Bebop-1

Bebop-2

### A

■■■ Speedplay alleged infringement of 12 of the '778 patent's claims, including independent claim 1, which reads in relevant part as follows:

A clipless bicycle pedal system for releasably binding the sole of a rider's shoe to a pedal which comprises:

a pedal comprising:

an axle fixedly attached to the end of a crank arm of a bicycle; and

a block rotatably mounted on said axle, said block having a top, a bottom and a circumferential edge, said top and said bottom each being a generally convex surface, said block being generally circular in the lateral plane with said circumferential edges joining said top to [said] bottom and a leading edge and a trailing edge oppositely disposed within said circumferential edge, and having a plurality of grooves formed in said circumferential edge of said pedal and aligned with longitudinal and lateral planes of a bicycle on which said pedal system is mounted,

at least one of said grooves toward said trailing edge of said pedal block and one toward said leading edge . . . .

The critical language of the claim, for purposes of this case, is the reference to the body of the pedal as consisting of a "block having a top, a bottom, and a circumferential edge, said top and said bottom each being a generally convex surface." Relevant drawings showing the pedal block (item 12) and convex surfaces (item 13) of the '778 patent embodiment are set forth below.

Speedplay alleges that the trial court erred in finding no infringement of the '778 patent, either literally or under the doctrine of equivalents. Given the requirement that the pedal consist of a block with top and bottom surfaces that are generally convex, however, the trial court was plainly correct in finding that neither the Bebop–1 nor the Bebop–2 literally infringes claim 1 of the '778 patent. Neither the open ends of the Bebop–1 cylinder nor the open rings of the Bebop–2 structure have generally convex surfaces that serve as the top or bottom of a block, as is required by the '778 patent. Therefore, the Bebop pedals do not embody every limitation of the pertinent claims of the '778 patent and cannot literally infringe.

In order to find infringement of the '778 patent under the doctrine of equivalents, the court would have to find every limitation of claim 1 present in the Bebop pedals, either literally or equivalently. *See Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1315–19, 47 USPQ2d 1272, 1276–79 (Fed. Cir.1998). As in the case of literal infringement, the "convex surface" limitation of claim 1 defeats Speedplay's argument that the Bebop pedals infringe under the doctrine of equivalents.

■ Bebop's patent expert testified at trial that the convex surface of the block recited in the claim performs two functions. First, the convex surface compresses the tongues in the cleat as the cleat descends on the pedal; the tongues then resile upon encountering the open groove in the circumference of the pedal. Second, the convex surface causes the pedal to align with the cleat as the cleat descends onto it. Speedplay's patent expert agreed that the convex surface limitation performed both of those functions, and Bebop introduced evidence that a convex surface would promote self-alignment.

■ The patent specification and a statement made by Bryne in a reissue application for the '778 patent also focus on the self-alignment function of the convex-surface limitation. In a section entitled "Detailed Description of the Invention," the patent specification describes the cooperation between the pedal and the cleat as follows (numbers refer to items in the '778 drawings set forth above):

The rider places the shoe 25 with cleat 4 over pedal [assembly] 12. The symmetrical curved top surface of the pedal centers the recessed area 11 over pedal 12, guiding cleat 4 to its proper position. Even if the pedal is not parallel to [the] lateral plane . . . at the time the rider initially attempts to engage cleat 4 and pedal 12, the curved surface 13 of pedal

12 will cause block 12' [*i.e.*, the body of the pedal assembly] to rotate so that cleat 4 is centered over pedal 12.

In the reissue application, Bryne described the importance of the critical limitation as follows:

Clearly, the convex nature of the top and the bottom is essential to the function of the overall pedal system in order to properly interact with the cleat.... The convex surface of the top and the bottom situated on either side of a pedal platform ... [allows the pedal] to engage the cleat ..., even if the top or bottom is not perfectly vertically positioned immediately prior to attempted engagement of the pedal and cleat.

In deposition and trial testimony Bryne appeared to retreat from these comments, stating that the convex surface primarily serves to compress the tongues of the cleat and that "self-locating comes from having a circular shape in a circular shape." The trial court, however, was entitled to accord little weight to the "litigation-induced pronouncements of the inventor," which were contrary to clear statements in the written description and reissue application. *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1092, 46 USPQ2d 1257, 1263 (Fed.Cir.1998). Consequently, the trial court correctly determined that the convex surface limitation requires an equivalent structure in the Bebop pedals to perform a self-alignment function.

Although primarily focusing on the Bebop–2 pedal, the trial court determined that the Bebop pedals do not perform a self-aligning function, and the evidence supports that factual finding. Speedplay's expert claimed that a small bevel on the edges and rings of the Bebop pedal "enable[s] the initial engagement, ... the initial seating [of the pedal] into the recess." Bebop's witnesses, however, denied that the Bebop pedals perform a self-alignment function, and it was not clearly erroneous for the trial court to accept Bebop's evidence on that point and reject Speedplay's contrary evidence. We therefore affirm the trial judge's ruling that Bebop's products do not infringe the '778 patent.

**B**

■ Speedplay alleged that the Bebop products infringe three claims of the '009 patent under the doctrine of equivalents: independent claim 17, and dependent claims 20 and 21. Claim 17 provides in relevant part as follows (emphasis added):

A cleat for attachment to a sole of a bicycle shoe for use with a clipless bicycle pedal, said sole having a toe end and a heel end and a plurality of bores having a spacing according to an industry standard and being generally flat at its lower surface, said cleat comprising:

a first plate having a cavity at its center, *a first plurality of slots* generally aligned with said plurality of bores and at least one channel adjacent to said cavity, said cavity having a diameter for receiving at least a portion of said clipless bicycle pedal;

at least one spring means to be retained in said at least one channel so that a portion of said at least one spring means extends into said cavity;

a second plate abutting said first plate and having a perimeter corresponding to the perimeter of said first plate, *a second plurality of slots* aligned with said first plurality of slots and an opening corresponding to said cavity; and

a fastening means inserted through each slot of said *second plurality* and through each corresponding slot of said *first plurality* to be received in each bore of said plurality;

wherein insertion of said at least a portion of said clipless bicycle pedal into said cavity causes said spring means to releasably retain said clipless bicycle pedal adjacent to said sole.

The emphasized limitations resolve the infringement issue. The trial court construed "slot" to mean a "narrow notch,

groove or opening in a plate." Speedplay does not contest that construction. Relevant drawings from the '009 patent are set forth below, showing the first (item 50) and second (item 62) plurality of slots:

The cleats of the Bebop–1 and Bebop–2 are essentially identical for purposes of this case. Each has a metal base plate that attaches to the sole of the rider's shoe with two fasteners that pass through a two-hole washer and through each end of an elongated aperture in the base plate of the cleat. Two small crescent-shaped metal plates are mounted on either end of the base plate, accommodating the top edge of the cylindrical portion of the Bebop–1 pedal or top ring of the Bebop–2 pedal within the generally circular recess formed by the crescent plates' inner edges. Each crescent is attached with three fasteners and supported away from the base plate by spacers and by the stationary end of the spring-loaded tongue that secures the pedal to the cleat. The floating end of the spring-loaded tongue resides in the area under the crescent-shaped pieces of metal. Assembled and exploded views of the Bebop cleat are shown below.

Bebop Cleat

Speedplay's expert offered a limitation-by-limitation comparison of the '009 patent with the Bebop cleats. According to Speedplay's expert, the "first plate" limitation of claim 17 is met equivalently by combining Bebop's base plate and the spacers supporting the crescents. In the expert's view, the aperture in the base plate functions as the claimed "plurality of slots" by allowing the two fasteners to pass through the base plate and secure the cleat to the shoe. The second plate, the expert contended, comprises the two crescent-shaped plates and the two-hole washer that retains the base plate. The "second plurality of slots" limitation, according to the expert, is met equivalently by the two holes in the washer.

Although Speedplay's expert identified the structures in the Bebop cleats that he alleged to be equivalents of the two plurality-of-slots limitations in the patent, the expert did not identify the way the slot limitations perform the function of accommodating the fasteners that secure the cleat to the shoe. Therefore, his testimony did not establish that the corresponding structures in the Bebop cleat perform that

function in a substantially identical way. Speedplay's trial brief and the claim chart attached to it likewise failed to satisfy the legal standard for a finding of equivalence with respect to the slot limitations.

Strong and unrebutted evidence in the record supports the conclusion that the slots in claim 17 allow adjustment of the cleat's position on the sole, either forward-and-backward or side-to-side. For example, the '009 patent specification mentions adjustment frequently when referring to a slot, noting that the slots allow adjustment "to match the individual rider's foot and knee rotation for comfort, and to optimize energy transfer from the foot to the pedal." Discussing his development of the invention that resulted in the '009 patent, Bryne testified that the slots allow adjustment of the cleat on the sole.

Bebop's founder also testified that he understood the claimed slots to allow adjustment. As to the Bebop cleats, however, he testified that the single elongated aperture in the base plate allows "virtually no adjustability of the location of the fasteners." No evidence was offered to rebut that testimony.

Because the evidence indicates that the slot limitations in the '009 patent allow the fasteners to secure the cleat to the shoe in an adjustable way and that the corresponding structure on the base plate of the Bebop cleats—the elongated aperture—does not accommodate the fasteners in an adjustable way, the trial judge permissibly found that the Bebop cleats did not infringe the '009 patent under the doctrine of equivalents. *See Dawn Equipment Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1016–17, 46 USPQ2d 1109, 1113–14 (Fed. Cir.1998); *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199, 32 USPQ2d 1338, 1341–42 (Fed.Cir.1994).

## IV

■ The trial court rejected Speedplay's claim that Bebop infringed its trade dress rights. Under Ninth Circuit law, which applies to Speedplay's Lanham Act claim, Speedplay was required to prove that its trade dress is distinctive and nonfunctional, and that consumers are likely to confuse Bebop's pedals with Speedplay's pedals. *See Disc Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1005, 48 USPQ2d 1132, 1134 (9th Cir.1998). The trial court found that Speedplay proved its design to be distinctive, but did not prove nonfunctionality or likelihood of confusion.

■ Despite Speedplay's contrary assertion, the trial court considered the evidence offered by Speedplay and found that evidence insufficient to support a conclusion that confusion was likely. The court, unpersuaded by Speedplay's contrary evidence, determined that the two products are sold in distinct markets. In addition, the court acknowledged the isolated instances of actual confusion cited by Speedplay, but accorded them little weight under the circumstances. *Cf. Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 606–07, 1 USPQ2d 1809, 1813 (9th Cir. 1987) (concluding that the evidence of actual confusion was de minimis in light of the nature of the instances and the volume of the parties' business).

■ The trial court's finding that there was little likelihood of confusion is not clearly erroneous, which is the standard of review that the Ninth Circuit applies to a trial court's finding on that issue. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355–56, 228 USPQ 346, 348–49 (9th Cir.1985) (en banc). We therefore uphold the court's ruling on the trade dress issue without addressing the court's alternative ruling on the issue of functionality.

## V

At trial, Bebop sought to have Speedplay's patents declared unenforceable because of inequitable conduct on Speedplay's part. The trial court determined that Bebop did not show by clear and convincing evidence that Speedplay and its

counsel intended to mislead the Patent and Trademark Office (PTO) and therefore refused to hold the patents unenforceable. In its cross-appeal, Bebop claims that Speedplay and its counsel intentionally failed to disclose material prior art to the PTO during prosecution of the '778, '009, and '894 patents. In addition, Bebop alleges that the pendency of the present litigation was material information that Speedplay should have disclosed to the PTO in connection with the prosecution of the '894 patent. For those reasons, Bebop argues, the three patents should be held unenforceable.

A party alleging that a patent is unenforceable because of the patentee's failure to disclose material information to the PTO must offer clear and convincing evidence that the patentee intended to mislead the PTO. *See Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178, 33 USPQ2d 1823, 1826 (Fed.Cir.1995). The omission must be made with the specific intent to mislead, not merely from carelessness in the performance of a duty. *Id.* at 1181, 48 F.3d 1172, 33 USPQ2d at 1829. When a trial court makes a finding on the issue of intent in deciding an inequitable-conduct claim, we review that finding for clear error. *Id.* at 1178, 48 F.3d 1172, 33 USPQ2d at 1827.

Bryne and his patent counsel testified that they did not intend to deceive the PTO. Although they admitted familiarity with much of the prior art cited by Bebop, they contended that the prior art was not material. The trial judge credited their testimony regarding their opinions of the prior art, citing supporting evidence that some of the art taught away from the claimed invention, that similar patents had issued over the prior art, and that Speedplay's patent specifications discussed, in general terms, much of the prior art.

Although we agree with Bebop that a "mere denial of intent to mislead" does not suffice, *see Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1257, 43 USPQ2d 1666, 1669 (Fed.Cir. 1997), the trial judge's finding of lack of intent was supported by adequate evidence and was not clearly erroneous. The cases on which Bebop relies all involve stronger circumstantial evidence of deceptive intent. *See, e.g., Elk Corp. v. GAF Bldg. Materials Corp.,* 168 F.3d 28, 30–32, 49 USPQ2d 1853, 1855–57 (Fed.Cir.) (relying on the facts that the application claimed an improvement over the prior art, that the inventor's request for a patentability search noted the similarity of the art, and that the prosecuting attorney's testimony indicated knowledge that the prior art was material), *cert. denied,* —— U.S. ——, 120 S.Ct. 178, 145 L.Ed.2d 150 (1999); Critikon, 120 F.3d at 1256, 43 USPQ2d at 1669 (citing the patentee's knowledge that the prior-art reference read on a point of novelty that the examiner relied upon in prosecution); Molins, 48 F.3d at 1181–82, 33 USPQ2d at 1829 (drawing an inference of intent from the fact that the patentee had cited the art in foreign applications, but not in the U.S. application).

Bebop further contends that Speedplay engaged in a pattern of inequitable conduct that requires holding all three patents unenforceable. In *Consolidated Aluminum Corp. v. Foseco International Ltd.,* 910 F.2d 804, 812, 15 USPQ2d 1481, 1487 (Fed.Cir.1990), this court held that the intentional fabrication of a fictitious best mode in one patent rendered unenforceable three other patents in which the earlier concealment of best mode "permeated the prosecution." Our analysis in *Consolidated Aluminum* made clear, however, that we would have to find inequitable conduct sufficient to hold at least one patent unenforceable before considering whether to hold an entire group of related patents unenforceable. Because we have sustained the trial court's conclusion that no such inequitable conduct occurred in this case, we decline Bebop's invitation to hold all three of Speedplay's patents unenforceable because of an alleged pattern of inequitable conduct.

**1260**

## VI

Finally, Bebop claims that it is entitled to its attorney fees under 35 U.S.C. § 285 and Federal Rule of Civil Procedure 37(c).

In support of its claim for an award of fees under section 285, Bebop alleges that Speedplay acted inequitably and failed to conduct an adequate investigation before bringing suit. We have already upheld the trial court's ruling that Speedplay did not engage in inequitable conduct. With respect to the failure to investigate, Bebop contends that it incurred unnecessary legal fees preparing for trial on issues involving the '894 patent, which was held invalid because the invention was on sale more than one year before the patent application was filed. The court's ruling on the on-sale bar issue was based on an invoice that Speedplay produced during trial. Bebop claims that Speedplay did not adequately search its records in response to discovery requests regarding the first-sale date. Bebop also claims that it incurred additional, unnecessary expenses because Speedplay did not adequately determine whether the patent claims read on Bebop's products.

Bebop cites several cases for the proposition that section 285 fees should be imposed because Speedplay brought an action that it knew or "on reasonable investigation" should have known was unfounded. Those cases all involved more extreme conduct than was present here. In *Eltech Systems Corp. v. PPG Industries, Inc.*, 903 F.2d 805, 810, 14 USPQ2d 1965, 1969 (Fed.Cir.1990), for example, we affirmed an award of fees because the trial court had before it evidence that the patentee knew its action was unfounded. Similarly, in *Judin v. United States*, 110 F.3d 780, 784, 42 USPQ2d 1300, 1304 (Fed.Cir.1997), we upheld the imposition of sanctions because the patentee had not

procured a sample of the allegedly infringing device before filing suit, and in *Hughes v. Novi American, Inc.*, 724 F.2d 122, 124, 220 USPQ 707, 709 (Fed.Cir. 1984), an award of fees was affirmed because the patentee had undertaken widespread sales more than two years before the date of the patent application, yet resisted the defendant's efforts to have the patent declared invalid based on the on-sale bar.

The trial court in this case did not abuse its discretion by declining to award attorney fees to Bebop. Speedplay's attorneys engaged a qualified expert to prepare for trial on the patent infringement issues, and its discovery of an invoice for a sale that predated by two months the date previously given for its first sale does not constitute such egregious conduct as to compel the court to treat this as an exceptional case.

Bebop bases its request for fees under rule 37(c) on Speedplay's refusal to make certain admissions in response to Bebop's requests for admission. We have examined Bebop's list of requests and conclude that all of Speedplay's denials appear to have been made in good faith, based on a reasonable belief in the possibility of success at trial. Construing the trial court's denial of fees as a ruling on the rule 37 issue, we find that Bebop has failed to show that the court abused its discretion in denying Bebop's request for sanctions.

*AFFIRMED.*