# United States Court of Appeals for the Federal Circuit

---

**JODI A. SCHWENDIMANN, FKA JODI A. DALVEY,**
*Plaintiff/Counterclaim Defendant-Cross-Appellant*

**COOLER CONCEPTS, INC.,**
*Counterclaim Defendant-Cross-Appellant*

**v.**

**ARKWRIGHT ADVANCED COATING, INC.,**
*Defendant/Counterclaimant-Appellant*

---

2018-2416, 2019-1012

---

Appeals from the United States District Court for the District of Minnesota in No. 0:11-cv-00820-JRT-HB, Judge John R. Tunheim.

---

SEALED OPINION ISSUED:  May 5, 2020
PUBLIC OPINION ISSUED:  May 13, 2020*

---

\*    This opinion was originally filed under seal and is now unsealed in full.

———————————

DEVAN V. PADMANABHAN, Padmanabhan & Dawson, PLLC, Minneapolis, MN, argued for plaintiff/counterclaim defendant-cross-appellant and counterclaim defendant-cross-appellant. Also represented by MICHELLE DAWSON, ERIN DUNGAN, PAUL J. ROBBENNOLT.

MICHAEL HAWES, Baker Botts, LLP, Houston, TX, argued for defendant/counterclaimant-appellant. Also represented by LAUREN J. DREYER, Washington, DC; LAURA LYNN MYERS, KURT JOHN NIEDERLUECKE, Fredrikson & Byron, PA, Minneapolis, MN.

———————————

Before O'MALLEY, REYNA, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* WALLACH.

Dissenting opinion filed by *Circuit Judge* REYNA.

WALLACH, *Circuit Judge.*

Cross-Appellant Jodi A. Schwendimann filed a lawsuit in the U.S. District Court for the District of Minnesota ("District Court") against Appellant Arkwright Advanced Coating, Inc. ("Arkwright"), alleging infringement of U.S. Patent Nos. RE41,623, 7,749,581, 7,754,042, 7,766,475, 7,771,554, and 7,824,748 (collectively, the "Patents-in-Suit").[2] Following a jury trial, a judgment of willful

———————————

[2] U.S. Patent Nos. 7,749,581, 7,754,042, and 7,766,475 are continuations of an application which is a division of U.S. Patent Application No. 09/541,845 (filed on Apr. 3, 2000) ("the '845 application"), entitled "Method of Image Transfer on a Colored Base," which is a continuation-in-part of U.S. Patent Application No. 09/391,910 ("the '910 application"). U.S. Patent No. RE41,623 is the reissue of U.S. Patent No. 6,884,311, which was the resulting

infringement was entered against Arkwright, the jury awarded Ms. Schwendimann damages in the amount of $2,624,228.00, and the District Court allowed prejudgment interest of $1,915,328.00. *See Schwendimann v. Arkwright Advanced Coating, Inc.*, No.11-cv-00820-JRT-HB, 2018 WL 3621206, at *9 (D. Minn. July 30, 2018); J.A. 104–06 (Judgment).

Arkwright appeals. Ms. Schwendimann and her company Cooler Concepts, Inc. ("Cooler Concepts") cross appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1). We affirm.

BACKGROUND

I. Factual History

Starting in 1992, Ms. Schwendimann worked at American Coating Technologies, Inc. ("ACT"), J.A. 8594, which was owned by Nabil Nasser, J.A. 8595–96. ACT manufactured paper coating products. J.A. 8608. Ms. Schwendimann eventually became a vice president at ACT, J.A. 8597, and worked there until the company ceased operations in 2001, J.A. 8598. From 1998 through 2000, Ms. Schwendimann and Mr. Nasser filed two patent applications with the U.S. Patent and Trademark Office ("USPTO"), claiming inventions relating to image

---

patent of the '845 application. A continuing patent application is "an application filed subsequently to another application, while the prior application is pending, disclosing all or a substantial part of the subject-matter of the prior application and containing claims to subject-matter common to both applications, both applications being filed by the same inventor or his legal representative." *U.S. Water Servs., Inc. v. Novozymes A/S*, 843 F.3d 1345, 1348 n.1 (Fed. Cir. 2016) (internal quotation marks and citation omitted). The Patents-in-Suit relate to methods for transferring images onto a colored base. J.A. 277.

transferring sheets—U.S. Patent Application Nos. 09/150,983 ("the '983 application"), J.A. 703, 8619–22, and the '845 application, J.A. 703–04—in which both individuals were named as inventors. In 1999, Ms. Schwendimann filed a patent application, U.S. Patent Application No. 09/391,910 ("the '910 application"), in which Ms. Schwendimann was named the sole named inventor. J.A. 703. Ms. Schwendimann and Mr. Nasser conveyed assignment of all three applications to ACT in 1998 to 2000. J.A. 703–04.

When ACT ceased operations in 2001, it owed significant debt to various lenders, as well as to Ms. Schwendimann for her wages and sales commissions. J.A. 1344. ACT provided to Ms. Schwendimann a promissory note for the amount $282,073.25 for its outstanding debt to her. J.A. 8608. It had "become clear," however, that ACT would be unable to pay Ms. Schwendimann outright. J.A. 1344. At the same time, ACT owed attorney fees to its attorneys at the firm Schwegman, Lundberg & Woessner, P.A. ("SLW"), which were incurred during the prosecution of ACT's patent applications, and which amounted to around $25,000 to $30,000. J.A. 705, 1344. To settle its outstanding debts, ACT reached an agreement with Ms. Schwendimann, in which ACT transferred assignment of its patent applications—including the '983, '845, and '910 applications—to Ms. Schwendimann to satisfy its outstanding debt to her ("2001 Security Agreement"). J.A. 1344. In return, Ms. Schwendimann agreed to "take responsibility" for and satisfy ACT's debts to SLW. J.A. 18682–83. Ms. Schwendimann also agreed that she would not sue ACT for her unpaid wages. J.A. 8665. To memorialize the assignment of the applications, Mr. Nasser and Ms. Schwendimann met with an SLW attorney and instructed her to prepare and file the necessary documents to assign the applications to Ms. Schwendimann. J.A. 8682–83. In June 2002, SLW opened new client matters for Ms. Schwendimann regarding the three outstanding applications. J.A. 705.

In January 2003, SLW prepared a draft assignment of the '983 application. J.A. 705. The following month, Mr. Nasser executed the assignment of the '983 application on behalf of ACT, J.A. 733–37, and, the next day, SLW filed the executed assignment with the USPTO, J.A. 486–90. Throughout 2003, the SLW partner primarily representing both ACT and Ms. Schwendimann, Janal Kalis, J.A. 702, communicated with an SLW paralegal, Candy Buending, regarding the assignment of the '845 and '910 applications, J.A. 706. In both May and December 2003, Ms. Kalis sought confirmation from Ms. Buending that the assignments for the two applications were finalized. J.A. 706. Ms. Buending drafted assignments for both the '845 and '910 applications, J.A. 706, which Mr. Nasser never saw or signed, J.A. 1349–50.

In December 2003, SLW filed the following documents with the USPTO: (1) a fax filing cover sheet notifying and instructing the USPTO to record and attach an assignment for the '845 application; (2) a Recordation Form Cover Sheet notifying the USPTO that ACT had conveyed by assignment the '845 application to Ms. Schwendimann; and (3) a copy of the '983 application assignment with an alteration ("Hand-Altered Copy"). J.A. 707; *see* J.A. 501–03. The Hand-Altered Copy contains the '983 patent's title, application number, the execution date of the '983 application assignment, and Mr. Nasser's signature. J.A. 502–03. In the upper righthand corner, the Hand-Altered Copy also contains the handwritten number "1010.021." J.A. 502. SLW had assigned Ms. Schwendimann the internal client number of "1010" and used the number "1010.021" to reference the '845 application. J.A. 705. SLW acknowledged that it filed the incorrect assignment for the '845 application. J.A. 8468 ("So, [Ms. Kalis] attached the wrong assignment. No doubt about it."). The USPTO accepted the filing and altered the record owner of the '845 application in its database to Ms. Schwendimann. J.A. 707.

In 2011, Ms. Schwendimann claims she became aware for the first time that the incorrect assignment was filed with the USPTO for the transfer of the '845 application. Cross-Appellant's Br. 12. Subsequently, ACT assigned the Patents-in-Suit to Ms. Schwendimann ("2011 Assignment"), J.A. 8614–16, and it was recorded with the USPTO, J.A. 505–09. Ms. Schwendimann and ACT executed a satisfaction of debt agreement, which stated that ACT "is indebted to [Ms. Schwendimann] under" the Satisfaction of Debt Agreement, as well as the parties' 2001 Security Agreement and other bank loans "in excess of $600,000." J.A. 1283; *see* J.A. 1283–87 (Satisfaction of Debt Agreement). The parties agreed that "[ACT] hereby consents to [Ms. Schwendimann's] acceptance of certain of the [c]ollateral consisting of [ACT's] right, title and interest in certain patents as described on Schedule I[.]" J.A. 1284 (emphasis removed). Schedule I lists, inter alia, the Patents-in-Suit. J.A. 1287. The Satisfaction of Debt Agreement was approved by the surviving members of the ACT's Board of Directors ("Board"). J.A. 1290; *see* J.A. 1289–91 (ACT Written Action). In the ACT Written Action, the Board acknowledged that "ACT is currently indebted to [Ms. Schwendimann] . . . under a Promissory Note . . . in the principal amount of $282,073.25" and that, pursuant to the 2001 Security Agreement "[ACT] granted [Ms. Schwendimann] a security interest in [ACT's] personal property and all proceeds thereof[.]" J.A. 1289–90. It further acknowledged that ACT had received two loans from a bank, which were secured by ACT's personal property and that Ms. Schwendimann's company, Cooler Concepts, "purchased the [b]ank's rights to collect the [b]ank [l]oans and the [b]ank's collateral position[.]" J.A. 1289. Moreover, it stated that "[Ms. Schwendimann] has perfected her security interest in the [c]ollateral by (i) filing a UCC-1 Financing Statement with the Minnesota Secretary of State . . . and with the Wisconsin Department of Financial Institutions . . . and by (ii) recording an Assignment with

the [USPTO]." J.A. 1289.  Accordingly, the Board approved the Satisfaction of Debt Agreement.  J.A. 1289.

## II. Procedural History

In April 2011, Ms. Schwendimann filed a complaint against Arkwright for infringement of the Patents-in-Suit with the District Court.  J.A. 274–83 (Complaint).[3]   In July 2011, Arkwright asserted a lack of standing on the grounds that Ms. Schwendimann did not own the Patents-in-Suit.  J.A. 433–34 (Motion to Dismiss for Lack of Jurisdiction).  It was at this point that Ms. Schwendimann and ACT took corrective action, including the 2011 Assignment and the Satisfaction of Debt Agreement.  J.A. 8614–17; *see* J.A. 1289–91.  In January 2012, Arkwright moved to dismiss the Complaint for lack of standing and Ms. Schwendimann moved for summary judgment on the same issue.  J.A. 8.  In March 2012, the District Court denied both motions.  J.A. 1–18.  In doing so, the District Court determined the Hand-Altered Copy constituted an "instrument in writing" pursuant to 35 U.S.C. § 261 (2006).  J.A. 13; *see* J.A. 9–13.[4]  The District Court determined that it did not

---

[3]    Ms. Schwendimann originally filed suit against Arkwright in 2008, which was stayed pending reexamination of the Patents-in-Suit.  *See Schwendimann v. Arkwright*, No. 8-cv-162, D.I. 100 (D. Minn. Aug. 19, 2008).  Following reexamination, the parties stipulated to Ms. Schwendimann refiling the Complaint in 2011.  *See* Appellant's Br. 4 n.1, Cross-Appellant's Br. 4.

[4]    Section 261 of Title 35 of the United States Code states:

Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.  The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his

have sufficient evidence to assess whether the Hand-Altered Copy constituted a valid assignment of the '845 application. J.A. 17. The production of additional discovery ensued, after which Ms. Schwendimann renewed her motion for summary judgment on standing and the District Court granted it, finding that there was no genuine issue of material fact that ACT had assigned the '845 application to Ms. Schwendimann in 2002. J.A. 26–30. Arkwright appealed the decision to this court. *See Schwendimann v. Arkwright Advanced Coating, Inc.*, 506 F. App'x 996 (Table), at \*1 (Fed. Cir. 2013). "[W]e decline[d] to entertain this interlocutory appeal." *Id.*

Following a jury trial, a judgment of willful infringement was entered against Arkwright and the jury awarded Ms. Schwendimann damages in the amount of $2,624,228.00. J.A. 39–40. Subsequently, the District Court awarded prejudgment interest on the damages in the amount of $1,915,328.00. *See Schwendimann*, 2018 WL 3621206, at \*23; *see also* J.A. 104–05. Relevant here, the District Court determined that it would award a 10 percent prejudgment interest rate, pursuant to Minnesota Statute § 549.09 (2015). *See Schwendimann*, 2018 WL 3621206, at \*22.[5] First, the District Court rejected Arkwright's proposed 1.42 percent interest rate, concluding that it was "unpersuaded" that such a rate "[wa]s sufficient to place [Ms.] Schwendimann 'in as good a position as [s]he would have been in had [Arkwright] entered into a reasonable royalty agreement.'" *Id.* (quoting *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983)). Second, the District Court determined that the prejudgment

---

application for patent, or patents, to the whole or any specified part of the United States.

[5]    Section 549.09 states that, "[f]or a judgment or award over $50,000, . . . the interest rate shall be ten percent per year until paid." MINN. STAT. § 549.09(c)(2).

interest rate should be calculated based on the amount of damages awarded by the jury and not of Arkwright's final settlement offer, as Arkwright failed to provide a written offer. *Id.* Third, the District Court concluded that prejudgment interest should be calculated on the total damages and not based on the number of infringing sales per year. *Id.*

## DISCUSSION

On appeal, Arkwright contends that the District Court erred in finding that Ms. Schwendimann had standing, Appellant's Br. 28, and in its award of prejudgment interest, *id.* at 60. We discuss each issue in turn.

### I. The Photocopy Assignment

### A. Standard of Review and Legal Standard

When the district court entered the judgment at issue in this appeal, it did not have the benefit of our recent precedential decision in *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1299 (Fed. Cir. 2019). Nor did the parties when they filed their appellate briefs. In *Lone* Star, we made clear that whether one qualifies as a patentee under 35 U.S.C. § 281 is a statutory prerequisite to the right to relief in a patent infringement action, but does not implicate the district court's subject matter jurisdiction. There, we recognized that intervening Supreme Court precedent made clear that our earlier decisions treating the prerequisites of the Patent Act as jurisdictional were wrong. We expressly held that "[w]e therefore firmly bring ourselves into accord with *Lexmark* [*Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)] and our sister circuits by concluding that whether a party possesses all substantial rights in a patent does not implicate standing or subject-matter jurisdiction." *Lone Star*, 925 F.3d at 1235–36. As long as a plaintiff alleges facts that support an arguable case or controversy under the Patent Act, the court has both the statutory and

10        SCHWENDIMANN v. ARKWRIGHT ADVANCED COATING

constitutional authority to adjudicate the matter. *Id.* at 1235 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)). Because Ms. Schwendimann's Complaint contained such allegations— that she is the owner by assignment of the '845 patent and Appellants infringed that patent—there is no "standing" issue to be decided in this appeal.[6]

---

[6]    The dissent disagrees and asserts that the Patent Act's prerequisites must be treated as jurisdictional because the right to exclude has constitutional underpinnings. There are two problems with that contention. First, *Lone Star* states the opposite in a precedential decision. The dissent, like all subsequent panels, is bound by *Lone Star*. Second, not only has the Supreme Court made clear that virtually all statutory filing prerequisites are non-jurisdictional, *see, e.g.*, *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1846 (2019) (Title VII's charge-filing instruction is non-jurisdictional); *United States v. Kwai Fun Wong*, 575 U.S. 402, 410 (2015) ("But traditional tools of statutory construction must plainly show that Congress imbued a procedural bar with jurisdictional consequences. In applying that clear statement rule, we have made plain that most time bars are nonjurisdictional."); *Union Pacific R. Co. v. Brotherhood of Locomotive Engineers and Trainmen General Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 82 (2009) (providing that the Clean Air Act's instruction that, to maintain an objection in court on certain issues, one must first raise the objection "with reasonable specificity" during agency rulemaking, is non-jurisdictional), but it has held that the registration requirement in the Copyright Act is non-jurisdictional, *see Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010). The Copyright Act is no less tied to the Intellectual Property Clause in the Constitution than is the Patent Act.

Thus, despite the way the parties have framed the issue in their briefing, the only questions we must decide are whether Ms. Schwendimann was a patentee at the time her action was filed and, if that status was conferred upon her by assignment, whether that assignment is reflected in a written instrument within the meaning of 35 U.S.C. § 261. We answer both questions in the affirmative.

Under Title 35, only a "patentee" is permitted to pursue a patent infringement action, 35 U.S.C. § 281. A "patentee" includes "not only the patentee to whom the patent issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). "If the party asserting infringement is not the patent's original patentee, the critical determination regarding a party's ability to sue in its own name is whether an agreement transferring patent rights to that party is, in effect, an assignment or a mere license." *Lone Star*, 925 F.3d at 1299 (internal quotation marks and citation omitted). "[A]n assignee is the patentee and has standing to bring suit for infringement in its own name." *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998) (citing 35 U.S.C. § 100(d)). To confer patentee status to the assignee, an assignment must be documented in an "instrument in writing[,]" but there are no form or content requirements for the written instrument specified in the statute. 35 U.S.C. § 261; *see id.* ("Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.").

In addition to the § 261 written instrument requirement of assignment, the plaintiff must have the legal title to the patent or patent application, which is determined by state law. *See Enovsys LLC v. Nextel Commc'ns Inc.*, 614 F.3d 1333, 1342 (Fed. Cir. 2010) ("Who has legal title to a patent is a question of state law." (citation omitted)); *see also Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1571 (Fed. Cir. 1997) ("It may seem strange at first blush that the question of whether a patent is valid and infringed ordinarily is one for federal courts, while the

question of who owns the patent rights . . . is a question exclusively for state courts. Yet that long has been the law.").

The assignment of a patent's legal title is interpreted in accordance with contract statutes and common law in the state where the assignment took place, *see Tri-Star Elecs. Int'l Inc. v. Preci-Dip Durtal SA*, 619 F.3d 1364, 1367 (Fed. Cir. 2010), here Minnesota. Under Minnesota law, contracts are construed consistent with the parties' intent and, where a written contract does not accurately reflect the parties' intentions, a court may reform the contract to reflect the parties' intentions. *See Gartner v. Gartner*, 74 N.W.2d 809, 812 (Minn. 1956). To reform a contract under Minnesota law, a party must provide proof that:

> (1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties, or a unilateral mistake accompanied by fraud or inequitable conduct by the other party.

*Nichols v. Sherlard Nat'l Bank*, 294 N.W.2d 730, 734 (Minn. 1980).

### B. Ms. Schwendimann Is the Owner of the '845 Patent by Assignment

The District Court concluded that, at the time she filed her Complaint, Ms. Schwendimann was a patentee entitled to sue for infringement of the '845 patent because she is the assignee of the '845 application and holds legal title to both that application and the subsequent '845 patent. J.A. 36. Arkwright contends that the District Court clearly erred in reaching that conclusion because the '845 application was assigned to ACT, not Ms. Schwendimann, at the time the infringement action was filed. Appellant's Br. 29. We disagree and find that the District Court did not err.

Arkwright does not seriously dispute the District Court's finding that ACT intended to assign the '845 application to Ms. Schwendimann at the time the application was filed. While Arkwright contends that the 2011 Assignment evidences that no assignment was intended in 2002 when the application was filed, all other evidence supports the District Court's contrary conclusion. The District Court properly concluded that the assignment for the '845 application granted legal title to Ms. Schwendimann. There was a valid agreement between Ms. Schwendimann and ACT. *See Nichols*, 294 N.W.2d at 734. Both ACT and Ms. Schwendimann confirmed that in 2002, ACT offered to assign the '845 application to Ms. Schwendimann and she accepted that offer in exchange for the consideration that she agree not to file suit against ACT for her unpaid wages and sales commissions, as well as for her acceptance of ACT's debt to SLW for the patent applications she was being assigned. J.A. 8661–62, 8664–65, 9601. Ms. Schwendimann's conduct confirmed the contract, as she performed her portion of the agreement by not filing suit against ACT and satisfying the outstanding debts with SLW. J.A. 8688; *see Holt v. Swenson*, 90 N.W.2d 724, 728 (Minn. 1958) ("It is well settled that acceptance of an offer may be by conduct[.]"). Moreover, the Hand-Altered copy of the '983 application shows that the parties informed counsel that an assignment was to be made, even if counsel did not accurately reflect the parties' precise intentions. Finally, the Patents-in-Suit all listed Ms. Schwendimann as the assignee, without challenge by ACT for almost a decade before this litigation took place. J.A. 33. In light of all of this testimony, the District Court did not clearly err in concluding that the 2011 Assignment, taken in context with the testimony of Ms. Schwendimann and Mr. Nasser, merely reaffirmed the 2002 agreement. J.A. 8614–17.

Perhaps recognizing the difficulty of debating the District Court's findings with respect to what the parties intended in 2002, Arkwright primarily focuses on the writing

requirement of § 261. *See generally* Appellant's Br., Cross-Appellant's Br. It argues that the District Court lacked the authority to reform the writing after the fact to reflect the parties' understanding as of 2002 and that, if it did have that authority, the assignment would not be effective until the reformation actually occurred and the writing requirement was satisfied. We disagree on both points.

We see nothing in § 261 or our case law interpreting the statute that specifies the type of writing that is necessary to convey an assignment of patent rights, nor do we see any reason why state law contract principles, including those pertaining to reformation, would not apply with equal force to such writings. Here, the District Court concluded that the written instrument that SLW provided to the PTO in connection with the '845 application failed to express the real intention of the parties as of that date. The District Court found that the reason it failed to express the parties' intentions was due to a mutual mistake of fact. J.A. 35; *see* J.A. 32–35. Accordingly, because all reformation requirements were met, *see Nichols*, 294 N.W.2d at 734 (requiring, for contract reformation: a "valid agreement between the parties expressing their real intentions"; a "written instrument [that] failed to express" those real intentions; and "this failure was due to a mutual mistake of the parties"), the District Court properly reformed the Hand-Altered Copy as an assignment for the '845 application and determined that Ms. Schwendimann was the "patentee" as of the date that the handwritten instrument was submitted to the USPTO. J.A. 35; *see Tri-Star*, 619 F.3d at 1367 (explaining that a good-faith mistake does not deprive the assignment of its force and the standing it conveys); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250–51 (Fed. Cir. 2000) (holding that a licensing agreement conferred standing even though the license agreement included the wrong patent number because "substantial patent rights were transferred").

When a court reforms a contract, it simply assures that the written instrument properly reflects the parties' agreement. The agreement was effective when made, not as of the date of the reformation. The written instrument requirement in § 261 does not define when the agreement occurs, it merely requires that some writing confirm the fact of assignment. By virtue of the reformation, the written instrument was corrected *nunc pro tunc*, to the point of the assignment.

It is for these same reasons that the dissent's reliance on our prior holdings in *Paradise Creations, Inc.* and *Gaia Technologies* is unpersuasive. *See* Dissent Op. at 4 (citing *Paradise Creations, Inc. v. UV Sales*, 315 F.3d 1304 (Fed. Cir. 2003); *Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774 (Fed. Cir. 1996)). Even putting aside the fact that both cases significantly predate *Lone Star* and the Supreme Court case law on which it relies, neither case involves a district court's *reformation* of a contract, to properly reflect a valid, pre-existing transfer agreement. *See Paradise Creations*, 315 F.3d at 1309 (holding that a state corporate revival statute cannot retroactively confer Article III standing); *Gaia Techs.*, 93 F.3d at 779 (holding that an assignment, executed on October 24, 1994, but which claimed to be effective "prior to Gaia's filing of the instant suit," was not sufficient to confer standing on Gaia).[7] The Hand-Altered copy is not a later license that the parties declare transferred rights as of some earlier effective date. The District Court's reformation of the writing simply confirmed the earlier written transfer of the license—both the transfer and the writing predated the filing of the lawsuit.

---

[7]    *Abraxis Bioscience, Inc. v. Navinta LLC*, 672 F.3d 1239 (Fed. Cir. 2011) (denial of reh'g en banc) is distinguishable for the same reasons.

To understand this principle, it is helpful to consider an analogous context: reformation of written instruments that are subject to the statute of frauds. Restatement (Second) of Contracts discusses reformation for statute of frauds contracts—certain types of contracts that, under common law, must be executed in writing—and states: "If reformation of a writing is otherwise appropriate, it is not precluded by the fact that the contract is within the Statute of Frauds." Restatement (Second) of Contracts § 156 (1981). The Restatement explains that the premise underlying this rule is that a writing evidencing an agreement may be reformed *before* it is subjected to the requirements of the Statute of Frauds because the Statute does not bar reformation in such a case. Moreover, Minnesota courts have applied reformation to deeds and contracts that require a written agreement. *See, e.g.*, *Olson v. Erickson*, 44 N.W. 317, 318 (Minn. 1980); *Olson v. Olson*, No. C9-97-1978, 1998 WL 170111, at *1 (Minn. Ct. App. Apr. 14, 1998) ("Where a written contract fails, through mistake or fraud, to express the actual oral agreement, it may be reformed even though it comes within the statute of frauds."). Following the Restatement's logic, the assignment with the Hand-Altered Copy may be reformed *before* it is subjected to the requirements of § 261 because the statute does not bar reformation. Here, Ms. Schwendimann was the patentee by virtue of an assignment that occurred before the suit was filed. While the writing needed to satisfy § 261 had to be reformed, it suffices that reformation occurred before judgment was entered in the infringement action.

Finally, despite the dissent's arguments otherwise, our precedent does not suggest that in the context of agreements assigning existing patents, federal law governs the interpretation of these contracts. We recognize that, in the context of employment agreements assigning rights to *future* inventions, our decision in *DDB Technologies v. MLB Advanced Media*, 517 F.3d 1284 (Fed. Cir. 2008) established an exception to the general rule that state law

governs the interpretation of assignment employment agreements.  We have not held that such an exception should be extended to agreements assigning *existing* patents, especially where those assignments occur outside of the employment context.  *See, e.g.*, *Enovsys*, 614 F.3d at 1342; *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1327 (Fed. Cir. 2009) (holding that "questions of patent ownership are determined by state law"); *Euclid Chem. Co. v. Vector Corrosion Techs., Inc.*, 561 F.3d 1340, 1343 (Fed. Cir. 2009) ("Construction of patent assignment agreements is a matter of state contract law." (quoting *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1370 (Fed. Cir. 2008))); *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1376 (Fed. Cir. 2007) ("[T]he only question is one of ownership.  State law, not federal law, addresses such property ownership disputes.").

Accordingly, we find that the District Court did not err in concluding that (1) Ms. Schwendimann was a patentee at the time of her Complaint; and (2) as of that same time there was a valid agreement between ACT and Ms. Schwendimann in 2002 to assign the '845 application to Ms. Schwendimann and make her the patentee within the meaning of 35 U.S.C. § 281.  For all of these reasons, we reject Arkwright's claim that the lower court judgment must be set aside because Ms. Schwendimann was not a patentee entitled to pursue infringement claims relating to the '845 patent at the time this action was filed.

## II. Prejudgment Interest

### A. Legal Standard

Upon a finding of infringement, "the [district] court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.  "[P]rejudgment interest should ordinarily be awarded where necessary to afford the plaintiff full

compensation for the infringement." *General Motors*, 461 U.S. at 654. Prejudgment interest is not a penalty, but instead "serves to make the patent owner whole, for damages properly include the foregone use of money of which the patentee was wrongly deprived." *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996). Awarding "prejudgment interest is the rule, not the exception." *Id.* We afford district courts "wide latitude in the selection of interest rates," and have permitted the use of statutory rates set by states, U.S. Treasury bill rate, and the prime rate. *See Gyromat Corp. v, Champion Spark Plug Co.*, 735 F.2d 549, 556 (Fed. Cir. 1984) (citing cases); *see also Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) ("A trial court is afforded wide latitude in the selection of interest rates . . . and may award interest at or above the prime rate." (internal citations omitted)). We review the award of prejudgment interest for abuse of discretion, "basing the award on clearly erroneous factual findings, legal error, or a manifest error of judgment." *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995).

### B. The District Court Did Not Abuse Its Discretion in Awarding Prejudgment Interest

The District Court granted Ms. Schwendimann prejudgment interest at a rate of 10 percent per year. J.A. 91. Arkwright contends the District Court abused its discretion in awarding prejudgment interest on the entire damages from the first infringement date. Appellant's Br. 60. We disagree with Arkwright.

The District Court did not abuse its discretion in granting a prejudgment interest rate of 10 percent, starting from the first date of infringement. Typically, "prejudgment interest should be awarded from the date of [the] infringement to the date of [the] judgment." *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 800 (Fed. Cir. 1988). Where a jury awards a lump-sum amount as compensation for

infringement, the prejudgment interest is properly applied to the entire amount beginning on the first date of the infringement. *See Comcast IP Holdings I LLC v. Spring Commc'ns Co., L.P.*, 850 F.3d 1302, 1315 (Fed. Cir. 2017) (affirming the "district court's assessment of prejudgment interest against [an infringer] based on the entire royalty award" where the jury awarded a lump-sum amount). The District Court did not abuse its discretion by awarding prejudgment interest in the amount of 10 percent, pursuant to the rate set by § 549.09 of the Minnesota Statutes. *See Gyromat Corp.*, 735 F.2d at 556 (upholding the award of a prejudgment interest rate set at the state statutory rate as within the district court's discretion); *see also Oiness v. Walgreen Co.,* 88 F.3d 1025, 1028, 1033 (Fed. Cir. 1996) (upholding the application of a state statutory prejudgment interest rate of 8 percent, while remanding the prejudgment interest award on other grounds); *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1520 (Fed. Cir. 1984) (upholding the district court's selection of a 6 percent prejudgment interest rate, "[t]hough the [district] court could have selected a higher interest rate"). Accordingly, the District Court did not abuse its discretion in its award of prejudgment interest.

## CONCLUSION

We have considered the parties' other arguments and each of the remaining issues raised on appeal and find them to be without merit. Accordingly, the Judgment of the U.S. District Court for the District of Minnesota is

## **AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

---

**JODI A. SCHWENDIMANN, FKA JODI A. DALVEY,**
*Plaintiff/Counterclaim Defendant-Cross-Appellant*

**COOLER CONCEPTS, INC.,**
*Counterclaim Defendant-Cross-Appellant*

**v.**

**ARKWRIGHT ADVANCED COATING, INC.,**
*Defendant/Counterclaimant-Appellant*

---

2018-2416, 2019-1012

---

Appeals from the United States District Court for the District of Minnesota in No. 0:11-cv-00820-JRT-HB, Judge John R. Tunheim.

---

REYNA, *Circuit Judge,* dissenting.

Our jurisprudence on standing is clear. A plaintiff must have Article III standing at the time it filed suit. Post-suit activities cannot confer Article III standing that was otherwise lacking when the suit was filed. The clarity of this principle is welcome, for litigants require clear notice of how to satisfy the constitutional threshold of standing. The majority obscures the principle, however, by blessing the district court's post-suit cure of Ms. Schwendimnn's lack of constitutional standing at the time she filed her complaint. I dissent.

2        SCHWENDIMANN v. ARKWRIGHT ADVANCED COATING

I

As an initial matter, and contrary to the majority's opinion, the crux of the jurisdictional issue on appeal is not merely statutory—i.e., whether Ms. Schwendimann can be classified as a "patentee" with "all substantial rights" in the patent under 35 U.S.C. § 281. The issue is constitutional—i.e., whether Ms. Schwendimann had *any* requisite "exclusionary rights" in the patents-in-suit at the time of filing her infringement suit to establish Article III standing. *See* Maj. Op. at 9–10; *see also Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234–35 (Fed. Cir. 2019).[1]    If a party has no Article III standing, the

---

[1]    The majority asserts that the dissent requires the Patent Act's prerequisites to be jurisdictional requirements, which allegedly conflicts with *Lone Star*. *See* Maj. Op. at 10. This is incorrect. The majority misreads both the dissent's position and *Lone Star*. The dissent does not propose that the Patent Act's prerequisites are jurisdictional. Rather, the dissent is faithful to well-established law that Article III standing is a separate and overriding requirement from statutory standing. *See Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) (noting the "settled" principle that "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing"); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979) (recognizing that although "Congress may, by legislation, expand standing to the full extent permitted by Art. III," "[i]n no event . . . may Congress abrogate the Art. III minima"); *see also Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1175 (Fed. Cir. 2017) (holding that a petitioner for inter partes review before the Patent Trial and Appeal Board lacked Article III standing before this court, notwithstanding the petitioner's statutory right to appeal under 35 U.S.C. § 319).

standing inquiry ends and the case must be dismissed. *Lone Star* does not hold otherwise. Rather, *Lone Star* clarified that a party that fails to satisfy the statutory standing requirements under the Patent Act— i.e., "*all* substantial rights" in the patent—may nonetheless meet the baseline constitutional standing threshold, so long as the party holds *some* exclusionary rights in the patent. 925 F.3d at 1234–35.

The facts in this case highlight the constitutional standing issue. On April 1, 2011, when Ms. Schwendimann filed her infringement suit, she alleged that she owned the patents-in-suit. She did not. Ms. Schwendimann argued that she became the owner when she was assigned the '845 application, from which these patents issued, via the "Hand-Altered Copy" assignment. Ms. Schwendimann never asserted, before the district court or on appeal, that she had any exclusionary rights in the patents-in-suit at the time of filing separate and apart from the Hand-Altered Copy.

Below, the district court determined that under Minnesota state law, the Hand-Altered Copy only assigned rights to Ms. Schwendimann in the '983 application, not the '845 application. J.A. 13.[2] At this point, the district court should have dismissed Ms. Schwendimann's complaint for lack of Article III standing because on April 1, 2011, the day the underlying suit was filed, Ms. Schwendimann had no enforceable, exclusionary rights in the patents-in-suit.

---

[2]   Contrary to the majority's assertion, the dissent does not suggest that the Hand-Altered Copy be interpreted under federal law. *See* Maj. Op. at 16. As noted above, the district court interpreted the Hand-Altered Copy under *Minnesota state law* as unambiguously assigning only the '983 application. No party disputes this determination on appeal, and, thus, this interpretation stands.

The district court, however, reformed the Hand-Altered Copy in order to retroactively grant Ms. Schwendimann enforceable, exclusionary rights in the '845 application effective at the time of filing. Whether post-suit reformation can be an exception to the fundamental Article III requirement that standing be present *at the time of filing* is a question of *constitutional standing* and is an issue of first impression. Thus, contrary to the majority's reasoning, we cannot bypass this constitutional standing issue. *See AsymmetRx, Inc. v. Biocare Medical, LLC*, 582 F.3d 1314, 1318 (Fed. Cir. 2009).

## II

"Whether a party has standing to sue in federal court is a question of federal law." *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003). Article III standing, like other bases of jurisdiction, must be present at the inception of the lawsuit. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 570 n.5 (1992) (plurality opinion) ("[S]tanding is to be determined as of the commencement of suit."); *see also Keene Corp. v. United States,* 508 U.S. 200, 207 (1993) ("[T]he jurisdiction of the Court depends upon the state of things at the time of the action brought."). Based upon this Supreme Court jurisprudence, we have held that "in a patent infringement action, the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit to assert standing." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010) (internal quotation marks omitted). In other words, the plaintiff is required to have at least some enforceable, exclusionary rights "to the patents on the day it filed the complaint and that requirement ***can not be met retroactively***." *Id.* at 1366 (emphasis added). "[I]f the original plaintiff lacked Article III initial standing, the suit must be dismissed, and the jurisdictional defect ***cannot be cured after the inception of the lawsuit***." *Id.* at 1364 (internal quotation marks omitted) (emphasis

added).  We have consistently enforced the requirement that standing be present at the time of filing, even in the face of subsequent legal events that purport to have retroactive effect.

For example, plaintiffs who lacked a written assignment at the time filing cannot rely on post-suit assignments to fix a lack of standing at the time of filing.  *See Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998) ("[N]unc pro tunc assignments are not sufficient to confer retroactive standing.");  *see also Alps South, LLC v. Ohio Willow Wood Co.*, 787 F.3d 1379, 1384–86 (Fed. Cir. 2015);  *Abraxis Biosecience*, 625 F.3d at 1367;  *Gaia Techs., Inc. v. Reconversion Techs. Inc.*, 93 F.3d 774, 779–80 (Fed. Cir. 1996).

Likewise, we have rejected a plaintiff's attempt to retroactively revive an unenforceable license agreement in order to fix a lack of Article III standing. *Paradise Creations*, 315 F.3d at 1310.  In *Paradise,* the plaintiff was a Florida corporation that entered into a license agreement while administratively dissolved under Florida state law, which undisputedly rendered its license agreement unenforceable. *Id.* at 1308, 1310.  After suing for patent infringement in federal district court, the appellant was reinstated as a corporation under Florida state law. *Id.* at 1306.  Appellant argued that it had enforceable patent rights at the time of filing due to the Florida corporate revival statute, which provided that the reinstatement "relates back to and takes effect as of the effective date of the administrative dissolution and the corporation resumes carrying on its business as if the administrative dissolution had never occurred." *Id.* at 1309.  In other words, appellant argued that due to the Florida revival statute, its license agreement was always valid, and, thus, it possessed enforceable rights at the time of filing.  We rejected this theory, noting that "at the time the appellant filed its suit," the appellant

undisputedly "did not have enforceable rights to the patent," and, thus, "did not have standing to assert federal jurisdiction." *Id.* at 1310. We explained that the appellant cannot rely on the Florida corporate revival statute "to retroactively claim enforceable patent rights on the day it filed its complaint, in order to assert standing." *Id.*

I see no reasoned difference between Ms. Schwendimann's reliance on post-suit reformation in this case and the plaintiffs' reliance on nunc pro tunc agreements or the Florida revival statute in the above cases. Here too, Ms. Schwendimann filed suit without an enforceable, written assignment as to the patents-in-suit and is attempting to rely on post-suit activity to retroactively fix her defective assignment in order to confer standing. Remarkably, the district court in this case determined that the Hand-Altered Copy was unenforceable as to the '845 application at the time of filing. Thus, consistent with our precedent, Ms. Schwendimann cannot rely on the post-suit reformation to retroactively fix a standing defect.

To hold otherwise implicates the practical concerns we announced in *Gaia.* There, we rejected a plaintiff's attempt to fix a standing defect through a nunc pro tunc assignment and explained that:

> parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent [legal event] to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. . . . Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

*Gaia Techs.*, 93 F.3d at 780.

Like in *Gaia*, the majority's holding risks delay and multiple litigation.  For example, until a plaintiff with a defective assignment obtains a reformation, which could take years,[3] the assignor can file a separate suit, assert that it was the true assignee, and subject the defendant-infringer to multiple infringement suits for the same patent.  The defendant-infringer would have to defend itself in both suits, not knowing which party actually owned the patents.  Additionally, the assignor, unbeknownst to the plaintiff, could have assigned the patent in writing to a third party, who in turn sues the defendant-infringer in a separate suit.  For defending small businesses, whose core technology is at issue, the cost and uncertainty of multiple litigations can be devastating.  Therefore, as *Gaia* teaches, plaintiffs should bear the cost of shoring up their patent rights before filing suit to prevent such undue delay and expense.[4]

---

[3]    In this case, the Hand-Altered Copy was reformed in August 2012, one year and five months after Ms. Schwendimann filed suit.

[4]    The majority's position would also procedurally burden defendants.  In order to ascertain with certainty whether a plaintiff had the right to sue in the first place, a defendant will have to engage in costly discovery and litigation regarding the fact-intensive state law issue of reformation—which focuses on facts and circumstances not in the defendant's possession.  In this case, the defendant had to endure two rounds of briefing and discovery before the district court was prepared to rule on the issue of reformation.  This was an undue and unjustified burden for defendant to bear.  Instead, Ms. Schwendimann should have ironed out her patent rights with ACT, the assignor, before filing suit.

The majority's holding also implicates the same federalism concerns we raised in *Abraxis*. There, we held that plaintiffs could not fix a lack of standing by relying on a post-suit nunc pro tunc provision in an assignment, which under New York law would have retroactively conferred title pre-suit. 625 F.3d at 1367. The concurrence in denial of rehearing en banc explained that "[t]he district court, purportedly acting under New York state law, allowed the parties' intent to trump the clear language of the agreements [in existence at the time of filing]. ***State law cannot retroactively override federal law to revive failed agreements, thereby conferring standing in federal court***." *Abraxis Bioscience, Inc. v. Navinta LLC*, 672 F.3d 1239, 1241 (Fed. Cir. 2011) (Gajarsa, J., concurring in denial of reh'g en banc) (emphasis added). The concurrence thus rejected the district court's position, which would "apply state law to effectively preempt federal law." *Id.* at 1240–41.

Here, federal law requires a patent assignment to be in writing. *See* 35 U.S.C. § 261. As previously noted, for constitutional standing purposes, Ms. Schwendimann must have had an enforceable, written assignment of the '845 application at the time of filing her suit. *See Lone Star*, 925 F.3d at 1234. Yet, no party disputes that Ms. Schwendimann had no enforceable, written assignment for the '845 application at the time of filing. That ACT, the assignor of the '845 application, and Ms. Schwendimann may have orally agreed that she be the assignee pre-suit is not a sufficient jurisdictional hook under federal law. If it were, Section 261's writing requirement would be rendered meaningless. Thus, like the district court in *Abraxis*, the majority improperly permits state law (Minnesota state contract law) to retroactively override federal law (Section 261) in order to confer standing in federal court. *See Abraxis*, 672 F.3d at 1241.

Lastly, the majority's reliance on *Tri-Star Elecs. Int'l., Inc. v. Preci-Dip Durtal SA*, 619 F.3d 1364 (Fed. Cir. 2010) and *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000) is misplaced. In those cases, the district court did not rely on any post-suit activity to retroactively alter a defective assignment. Instead, the district court discerned from the four corners of the assignment that the plaintiff was the assignee of the patents-in-suit, despite a clerical error within the document, *Speedplay*, 211 F.3d at 1250–51, or based on the use of the term "successor," *Tri-Star*, 619 F.3d at 1367. Thus, in both cases, the district court held that based on the assignment as written at the time of filing, the plaintiffs had rights in the patents, and, thus standing. That did not occur here. The district court in this case determined under Minnesota state law that as written at the time of filing, the Hand-Altered Copy unambiguously assigned to Ms. Schwendimann the '983 application, not the '845 application, and could not be interpreted otherwise.

The majority's precedential decision will create uncertainty for litigants and courts. Until this case, this court has safeguarded the rule that plaintiffs must have formal, exclusionary rights at the time of filing regardless of state law doctrines that retroactively confer rights. *See, e.g.*, *Alps South*, 787 F.3d at 1384–86; *Abraxis Bioscience*, 672 F.3d at 1241; *Abraxis Bioscience*, 625 F.3d at 1366; *Paradise Creations*, 315 F.3d at 1310; *Enzo APA & Son*, 134 F.3d at 1093–94; *Gaia Techs.*, 93 F.3d at 780. That rule is now obscure. Even more, the newly created exception for the retroactive state law remedy of reformation opens the door for similar exceptions for other retroactive state law doctrines.

Equally unfortunate is that the district court's standing determination "has resulted in a substantial waste of judicial and litigant resources." *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1578 (Fed. Cir. 1997). "The

remedy for that, however, is not an equally unfounded assumption of jurisdiction." *Id.* at 1579. Instead, upon discovery of her standing defect, Ms. Schwendimann should have sought dismissal of the suit without prejudice and then either obtained a written assignment from ACT or sought reformation of the Hand-Altered Copy in state court. Then, having secured exclusionary rights in the '845 application, Ms. Schwendimann could have refiled suit in federal court. If there needs to be a cure in this case, that is it: dismiss and refile.

For these reasons, I dissent.